1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

TYRONE REED, Sr.,
         Petitioner,                  Case No.  13-cv-5455-TEH

    v.                                ORDER DENYING PETITION FOR
                                      WRIT OF HABEAS CORPUS; DENYING
MARTIN BITER,                         CERTIFICATE OF APPEALABILITY
         Respondent.

---

        Petitioner Tyrone Reed, Sr., a state prisoner, proceeds with
a pro se petition for a writ of habeas corpus under 28 U.S.C. §
2254.  Respondent was ordered to show cause why the petition
should not be granted.  Respondent has filed an answer and
Petitioner filed a reply.  For the reasons set forth below, the
petition is DENIED.

                                I

        Petitioner was found guilty after a jury trial of numerous
charges of child molestation against a child under the age of 14,
and the trial court found that Petitioner had two prior strike
convictions.  People v. Reed, 183 Cal. App. 4th 1137, 1139 (2010)
(Reed I).  He was sentenced to 230 years to life in prison.  Id.
at 1140.

Petitioner appealed and the California Court of Appeal reversed, stating:

> The judgment is reversed with directions to the trial court to make further inquiry into Reed's claim of ineffective assistance of counsel. If, after further inquiry, the court determines good cause exists for appointment of new counsel to fully investigate and present defendant's motion for new trial, the court shall appoint new counsel for that purpose and conduct further proceedings as necessary. If, on the other hand, the court determines after further inquiry that good cause does not exist for appointment of new counsel to fully investigate and present defendant's new trial motion, the court shall rule on the motion as presented by Reed. If the court denies the motion for new trial, the court shall reinstate the judgment.

Reed I, 183 Cal. App. 4th at 1149-50.

On remand, the trial court appointed new counsel who filed a motion for a new trial based on ineffective assistance of the original trial attorney. Clerk's Transcript ("CT") at 86-94; People v. Reed, No. A133225, 2013 WL 1276015, at *5 (Cal. Ct. App. March 28, 2013) (Reed II). On July 8, 2011, the trial court chose to not rule on the motion for a new trial and reaffirmed the judgment. CT at 106; Reed II, 2013 WL 1276015, at *7.

Petitioner appealed again and argued that: (1) the trial court violated the California Court of Appeal's directions in Reed I and abused its discretion in failing to rule on his motion for new trial; and (2) the trial court improperly limited the scope of appointed counsel's representation, depriving Petitioner of his right to counsel and due process. Reed II, 2013 WL 1276015, at *1. The California Court of Appeal affirmed the judgment. Id. The California Supreme Court denied a petition

United States District Court
Northern District of California

1    for review that raised the claim that the trial court's

2    limitations on the appointment of counsel on remand deprived

3    Petitioner of effective assistance of counsel on the motion for a

4    new trial.  Docket No. 1-5 at 7; Docket No. 5, Ex. 1.

5        Petitioner filed a federal habeas petition in this court on

6    November 25, 2013.  Several claims were previously dismissed as

7    unexhausted or procedurally defaulted.  Docket Nos. 13, 47.  The

8    case continues solely on the claim that the trial court's

9    limitations on the appointment of counsel on remand deprived

10   Petitioner of effective assistance of counsel on the motion for a

11   new trial.

12                              II

13       The following factual background is taken from the order of

14   the California Court of Appeal.[1]

15

                              Trial
16       Dianne [the 13 year-old victim] testified
         that the alleged offenses occurred while she
17       was sharing a room at the California Hotel
         with Reed, his "baby mama" (Bahati), and
18       Bahati's father in late 2006 and early 2007.
         Dianne said Reed had sexual intercourse with
19       her for the first time on October 8, and they
         were interrupted when Bahati knocked on the
20       door of the hotel room.  Dianne recalled the
         date because Reed had told her Bahati was
21       getting out of jail on October 8.

22       Dianne testified that, the next night, Reed
         tried to put his penis in her anus, and that
23       it went in a little, but "didn't go all the
         way in."  She said a couple of nights later,
24       Reed woke her up, got up off the bed and made
         a circular motion with his finger that
25       indicated to Dianne she should get up and
         turn around.  When she bent over and put her
26       hands on the bed, Reed put his penis in her

27    _____

28   [1] This summary is presumed correct.  <u>Hernandez v. Small</u>, 282 F.3d
     1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

United States District Court
Northern District of California

vagina from behind. Bahati and her father were asleep in the room at the time of both these incidents.

During that same week or two-week period, while Bahati and her father were absent, Reed grabbed Dianne and put her on the bed, pulled her pajama pants down, and touched her vagina with his tongue.

Dianne testified that all four of the incidents described above occurred before her 14th birthday in mid-November. Dianne stated that the following incidents occurred after her 14th birthday:

Reed whipped her with a belt approximately 25 times after she was suspended from school, leaving bruises on her thighs and arms and a knot on her head. The next day, she did not go to school. Reed bought some new panties for her and had her model them. He then put his mouth on her vagina.

On the night of February 4, 2007, while everyone else in the room was asleep, Reed forced his penis inside Dianne's vagina. This time, Reed was rougher and it "[d]idn't feel so good." Dianne asked Reed to stop, but he did not. Afterwards, Dianne experienced pain when she closed her legs and a burning sensation while urinating.

On February 5, 2007, Dianne reported the abuse, gave a statement to police, and submitted to a sexual assault exam. Photographs of her body showed bruising on her right arm, at the bicep and forearm. The sexual assault examiner noted these bruises, as well as resolving bruises on the inside of both of Dianne's knees, a lump on her forehead, and an abrasion to her cervix. The underpants she had been wearing the night before were collected, along with vaginal and oral swabs.

Reed was arrested that evening at the hotel. Officers collected a pair of red pajama bottoms and a T-shirt from the hotel room. An oral swab was collected from Reed and provided to the Oakland Police Department.

The criminalist at the Oakland Police Department Crime Laboratory who performed the DNA analysis in this case testified that sperm and epithelial cells were found on

4

Dianne's underpants; DNA was extracted from the sperm and analyzed; and a genetic profile for the sperm was generated and compared to a known DNA profile for Reed.  The profiles matched.  The DNA profile of the epithelial cells matched a known DNA profile for Dianne.  Sperm and epithelial cells were also found on one of the vaginal swabs.  The criminalist was able to obtain a partial profile for the male donor, which was consistent with Reed's reference profile.  Sperm and epithelial cells were also found in two stains on the pajama pants.  DNA was extracted and analyzed.  The profiles were consistent with the reference profiles for Dianne and Reed.

The evidence varied as to the time period Dianne lived with Reed.  Dianne testified that she moved from Reno to Oakland in September 2006, and stayed with her maternal grandmother for a couple of days.  After that, she stayed a week with Reed and then went to stay with Reed's sister, Keisha.  Dianne could not recall how long she stayed with Keisha but believed it was about a month or two.  She then went to live with Reed again at the California Hotel, where she remained until February 5, 2007.  She could not remember exactly when she returned to the hotel but said she did so before her 14th birthday.

Reed's grandmother, Lois, testified Dianne came to Oakland "around September" and stayed at her house for a few days, then went to live with Reed's sister, Keisha.  Keisha testified she was "not sure" how long Dianne stayed with Lois, but it could have been "about a month" or a little shorter.  Keisha said Dianne lived at her house for "[t]wo months, roughly" before she went to stay with Reed.

The parties stipulated that Dianne became enrolled in school on September 26, 2006.  Keisha said she registered Dianne for school "[a]bout two weeks" after Dianne began living with her.  Dianne said she was enrolled in school about a month after she arrived from Reno.

Keisha's daughter, Unique, testified that on her birthday, October 7, Dianne was living with her and Keisha.  Unique remembered this because she and Dianne went to a concert for her birthday.  Unique said Dianne stayed at

5

United States District Court
Northern District of California

her house for "[p]robably about two months"
after October 7.

Reed did not testify.

Posttrial Proceedings

After a verdict had been rendered, Reed's
counsel filed a written motion for new trial,
arguing that there was insufficient evidence
for the jury to find beyond a reasonable
doubt that any offenses occurred before
Dianne's 14th birthday.  On January 16, 2009,
after the trial court considered and denied
Reed's motion for new trial, Reed's counsel,
Deborah Levy, indicated to the trial court
that Reed wanted to file "a motion for
incompetence of counsel," but she did not
"know what vehicle to do."  The court
continued sentencing to January 30, 2009, to
allow Reed and Levy to talk.

On January 30, 2009, Reed's counsel again
advised the court that Reed was asking her to
request a new trial "based on [her]
incompetence."  Levy stated she had told him
"he is much better ... off having his
appellate attorney argue any issues of
incompetence," but "Mr. Reed would like to
make that motion.  I cannot make it for
him.... So, I am at a loss what to do."  The
court said, "Let's take one thing at a time"
and returned to the sentencing proceeding.

Later in the sentencing proceeding, Levy
stated that Reed was "again indicating ... he
wants to bring that motion regarding [her]
incompetence."  The court responded: "Mr.
Reed, ... [t]here are procedures of which I
have to adhere to, and when you are making a
motion to set aside this case based on your
counsel's incompetency, she's correct, that
is not something that I can take into
consideration at this time.  It is something
[that] an appellate lawyer will review with
you and will go over with you in detail what
your concerns are. [¶] But at this time you
are before this court for a report and
sentencing, and so the purview and things
that I have to take into consideration are
those things that are before me, the issues
that were presented to me in open court.  And
any dialogue you may have had with your
attorney, any preparation that may have taken
place for your case is something that is not
in the realm of things that I am privy to.
So, someone else will have to examine what

6

she did in preparation of your case, the presentation of it, as well as my ruling. [¶] So, I am not in the position to evaluate whether she was effective counsel or not, and turn around and review whether I am making an effective decision or not. Someone else will be in a position to do that."

Thereafter, the trial court sentenced Reed under the "three strikes" law to an aggregate prison term of 230 years to life.

The Prior Appeal: Reed I (A123967)

Reed appealed from the judgment of conviction. Among other arguments, he asserted that "the trial court erred by failing to inquire into the reasons for his desire to move for a new trial on the basis of incompetence of counsel," and that the case must be remanded to the trial court "for a full Marsden inquiry into the basis for [his] allegations of trial counsel's incompetence." In Reed I, a panel of this court agreed. (Reed I, supra, 183 Cal. App. 4th at p. 1140.) We concluded the trial court erred in failing to make any inquiry into Reed's reasons for believing he was ineffectively assisted at trial, including the requisite Marsden inquiries on such issues, as required by People v. Stewart (1985) 171 Cal. App. 3d 388 and People v. Mejía(2008) 159 Cal. App. 4th 1081.8 (Reed I, at pp. 1144–1145, 1148.) We were unable to conclude the error was harmless beyond a reasonable doubt "because it remains impossible on this record to determine whether further inquiry would have led the court to grant a new trial motion." (Id. at p. 1149.)

Accordingly, this court reversed the judgment "with directions to the trial court to make further inquiry into Reed's claim of ineffective assistance of counsel. If, after further inquiry, the court determines good cause exists for appointment of new counsel to fully investigate and present defendant's motion for new trial, the court shall appoint new counsel for that purpose and conduct further proceedings as necessary. If, on the other hand, the court determines after further inquiry that good cause does not exist for appointment of new counsel to fully investigate and present defendant's new trial motion, the court shall rule on the motion as presented by Reed. If the court denies the

motion for new trial, the court shall reinstate the judgment." (<u>Reed I</u>, <u>supra</u>, 183 Cal. App. 4th at pp. 1149–1150.)

The remittitur issued on June 23, 2010.

### Proceedings on Remand
### Appointment of New Counsel

On August 13, 2010, the trial court heard Reed's <u>Marsden</u> motion in a closed session. Reed appeared with his trial counsel. The trial court asked Reed to state the basis for his claim of incompetence of counsel, specifically, the reasons he felt his counsel did not present his case adequately and the areas where she failed to represent him. Reed said Levy [the trial counsel]: (1) failed to subpoena Bahati, his "alibi witness"; (2) failed to inform the jury, as he requested, that the prosecutor had released him twice on these charges for lack of evidence; (3) was unaware of documents indicating that Reed was not a DNA match and that the People's DNA expert lied on the stand; (4) failed to call a DNA expert to rebut the People's DNA witness, as he requested; and (5) failed to object to damaging testimony from Dianne's mother.

The trial court asked Levy to respond and discuss her trial preparation. Levy said she did not interview Bahati because it was her impression Bahati "was not a friendly witness," "was a prosecution witness," and "would not have been a good witness for the defense." As to the DNA evidence, Levy said she did not have her paperwork with her but was "99.9 percent sure that there was DNA testing done and some secretions from the victim and they came back to Mr. Reed without any question." She believed Reed was referring to a DNA test that failed to establish he was Dianne's father. Levy acknowledged, "[T]here was a lot of contention between Mr. Reed and I in my attempts to get him to take the deal that was on the table prior to the trial," and "there was some tension and some disagreement," but she could not recall any specific disagreements.

The trial court concluded it was appropriate to appoint counsel for Reed in two areas in which it could not make a conclusive determination based upon Levy's response: the DNA results, and "whether the failure to

8

interview the witness prior to trial in any way had a material impact on the outcome." The trial court relieved Levy and appointed Attorney Lorna Patton Brown to meet with Reed, review his case, and determine whether it was appropriate to file a motion for new trial. Notwithstanding its statements to Reed indicating counsel's representation would be limited to two issues, the trial court appears to have asked Patton Brown to investigate all of the ineffective assistance claims Reed asserted.

On October 25, 2010, Patton Brown moved to withdraw as Reed's counsel, as she was resigning from the California State Bar. A different superior court judge, Judge Morris Jacobson, granted the motion and appointed Attorney Thomas Broome to represent Reed.

### Reed's Motion for New Trial

On June 2, 2011, Broome filed a motion for new trial on Reed's behalf. The motion alleged that Reed was denied a fair trial because trial counsel failed to properly investigate the case and prepare a defense. Specifically, Reed contended trial counsel (1) failed to investigate an incident in which Dianne was allegedly found performing oral sex on a boy in a closet at the youth center (the closet incident) and (2) failed to subpoena independent witnesses to lay a foundation regarding this incident, resulting in its exclusion from evidence. In a related argument, Reed alleged defense counsel failed to call him to testify regarding the discipline he administered to Dianne as a result of the closet incident. Reed argued his testimony, in conjunction with evidence regarding the closet incident, would have impeached the victim's credibility by establishing her motive to falsely accuse him, particularly if it was "shown to be close in time to the delayed report to the police ... and remote in time as to when the alleged sexual acts occurred."

Reed also alleged that Levy failed to secure the records showing when Bahati was released from jail, and failed to obtain Dianne's birth certificate to show her age at the time of the alleged incidents. Finally, Reed contended Levy failed to preserve the record on appeal regarding the composition of the jury.

United States District Court
Northern District of California

9

Reed submitted declarations from Keisha, Unique, and trial counsel. Keisha stated that some teenagers told her Dianne was giving oral sex to a boy in the closet at the youth center, but Dianne denied this. Keisha also said Dianne came home late one night and lied about where she had been; Dianne said she was at the library, but there is no library near where Keisha lived. Unique stated when she and Dianne were 14 or 15 years old, a friend at the youth center told her Dianne was giving a boy a blowjob. Unique saw Dianne getting up from her knees next to a boy who was trying to "put himself back in his pants." Unique said she then walked home with Dianne and the boy, who had his hand down the front of Dianne's pants. Unique said Dianne "was always telling [her] about her 'sex' adventures: how many boys she had sex with" and "how good their sex was." Trial counsel stated she could not recall specifically whether Reed told her he wanted to testify, but if he had, she "would have, for certain, without a doubt, tried very strongly to convince him to change his mind."

The People filed an opposition to the motion, contending Reed had waived his attorney-client privilege as to matters he had placed at issue in his motion and the information in trial counsel's file was not protected to the extent it related to the issues raised by Reed's motion. The People asked the trial court to review trial counsel's file in camera and make the relevant information available.

The trial court heard Reed's motion on July 8, 2011. Noting the Court of Appeal had directed it to make further inquiry into Reed's ineffective assistance claim and to appoint new counsel to investigate and present his motion for new trial if it found good cause to do so, the court stated: "So we have already passed that juncture." "Now the next level of inquiry is that good cause does exist. The court is only determining whether further proceedings are necessary at this stage. [¶] If the court determines that further proceedings are not necessary, and that after full investigation there are no grounds for a new trial, the court will then reinstate the judgment." "[We are] now at that juncture where the court is seeking to determine whether, in fact, there are grounds for new trial and the basis therein. [¶] The

United States District Court
Northern District of California

10

court has already complied with the first portion of the remittitur."

After hearing argument from Reed's counsel, however, the trial court changed course. Turning to the transcript of the January 30, 2009 sentencing hearing, the court noted that, when Levy advised the court that Reed wanted to bring a motion regarding her incompetence, "[t]he word Marsden and no other words were used." The court concluded, that, in advising Reed in the earlier proceedings that his "motion to set aside this case based on [his] counsel's incompetence [was] not something [it could] take into consideration" and was "something that an appellate lawyer will review with you," it "basically was referring to what we call a Strickland error." The trial court stated: "I believe that the Court of Appeal [in Reed I], in reading that portion of the transcript, rather than taking the position that it was, in fact, a motion for incompetency of counsel, seems to be indicating to this court that that was alerting the court that it was a Marsden motion that they want—that Mr. Reed wanted to substitute counsel as opposed to incompetency. But that was perhaps based on the totality of the circumstances." The trial court noted it was to determine "what is the appropriate standard of review, what is the areas in which we must focus, and whether there is legal cause for this court to determine that a Marsden motion should be held. And then based on that Marsden motion, if it had been granted, what would have been the court's actions at that juncture ... having already had a jury determine the defendant's guilt or innocence."

The court listed the issues Reed had raised, stating it was "distill[ing] its understanding of the topics that [it] must focus upon in terms of the Marsden motion." In addition to the grounds asserted in Reed's motion for new trial and affidavits, the court noted "there is some reference to [Bahati], indicating that her testimony was not sought."

After hearing argument from the People, the trial court held, "Based on the totality of the circumstances, the review of today's hearing by way of motion, declaration, affidavit and record, ... the January 30,

11

United States District Court
Northern District of California

2009 findings shall remain. [¶] There does not appear to be grounds to set aside that order based upon grounds for a <u>Marsden</u> motion." The court again noted "the January 30th 2009 transcript in which counsel clearly indicated that it was a motion for incompetence. [¶] And so, the court does not reach the portion of the People's motion ... that [Reed] had waived his attorney-client privilege with regards to his motion for new trial. It is still this court's position that if there is <u>Strickland</u> error, that will take place on the appellate level. [¶] This hearing was really to determine whether there had been grounds for a <u>Marsden</u> motion.... [¶] Based on what I heard today, it appears a number of issues have to either do with admissibility of some items, foundational issues, and then finally perhaps tactical issues exercised by the defendant's counsel. And again, it is my position that that is something that, based on <u>Strickland</u>, would be reviewed by a higher court than this because, otherwise, we are entertaining the suggestion [in] the People's motion. And I don't believe that the directive of the Court of Appeal was to in any way invade upon the attorney-client privilege for the purpose of a new trial, but to determine whether there were grounds to substitute counsel at that juncture of the trial...."

Reed filed a timely amended notice of appeal from the judgment.

<u>Reed II</u>, 2013 WL 1276015, at *1-7 (footnotes omitted).

III

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the

12

facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by

United States District Court
Northern District of California

clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 562 U.S. 594, 598 (2011).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts.  See Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the state's highest court, the court "looks through" to the last reasoned opinion.  See Ylst, 501 U.S. at 804.

IV

A

Petitioner argues that the trial court's limitations on the appointment of counsel on remand deprived Petitioner of effective assistance of counsel with respect to the motion for a new trial which the trial court chose not to rule on.

14

The California Court of Appeal denied this claim:

Reed contends Judge Jacobson deprived him of his right to counsel by limiting the scope of Broome's [remand counsel's] investigation of his ineffective assistance claim. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; <u>Mempa v. Rhay</u> (1969) 389 U.S. 128, 134 ["appointment of counsel for an indigent is required at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected"].)

"[T]he right to the assistance of counsel has been understood to mean that there can be no restrictions upon the function of counsel in defending a criminal prosecution in accord with the traditions of the adversary factfinding process...." (<u>Herring v. New York</u> (1975) 422 U.S. 853, 857; accord, <u>United States v. Cronic</u> (1984) 466 U.S. 648, 656, fn. 15 (<u>Cronic</u>).) "Government violates the right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense." (<u>Strickland</u>, <u>supra</u>, 466 U.S. at p. 686.) Thus, "'[t]o satisfy the Constitution, counsel must function as an advocate for the defendant, as opposed to a friend of the court.'" (<u>Cronic</u>, at p. 656, fn. 17, quoting <u>Jones v. Barnes</u> (1983) 463 U.S. 745, 758, dis. opn. of Brennan, J.) Nonetheless, "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated. [Citations.]" (<u>Cronic</u>, at p. 658.)

On November 1, 2010, Judge Jacobson appointed Broome to represent Reed when Patton Brown withdrew from the case. The following exchange occurred:

"THE COURT: ... I've had the opportunity to speak with you informally. I'm providing you with a copy of the Court of Appeal opinion. [¶] The Court of Appeal sent this back for a very, very narrow issue, which is to

United States District Court
Northern District of California

investigate for the trial court . . . to make
an initial determination about whether
there's a possible ineffective assistance of
counsel claim as to a single witness in the
case. And [the trial court] previously
appointed Lorna Brown to do that
investigation. Ms. Brown is resigning from
the Bar and has now withdrawn from this
endeavor. [¶] Court Appointed sent another
attorney who came last Friday, Mr. Hetrick.
Mr. Hetrick was unwilling to accept any
limitation on his appointment whatsoever. I
tried to explain to him that the Court of
Appeal has defined the limits of this
representation at least initially, and [the
trial court] has made orders consistent with
that. So Mr. Hetrick was unwilling to accept
such limitations, so I declined to appoint
him. [¶] Mr. Broome, I've explained all that
to you informally and now on the record as
well. Are you prepared to accept appointment
for this limited issue?

"MR. BROOME: I am.

"THE COURT: Okay. You are appointed for that
purpose. . . ."

Judge Jacobson appears to have been
attempting to define the scope of Broome's
representation in a manner consistent with
[this court's] directions to the trial court
on remand in Reed I and with the trial
court's prior orders in the case. To the
extent he purported to limit the scope of
this representation beyond [this court's]
directions in Reed I or in contravention of
constitutional principles, Reed has not
established that this amounted to a violation
of his right to counsel. The record
demonstrates that Judge Jacobson provided a
copy of our opinion in Reed I to Broome, and
that Broome did not limit the scope of his
representation to the narrow issue defined by
Judge Jacobson, i.e., "whether there's a
possible ineffective assistance of counsel
claim as to a single witness in the case,"
or, indeed, even the issues the trial court
asked Patton Brown to investigate.

We see no indication Judge Jacobson's
instructions to Broome impacted his
representation of Reed, produced unfairness
in the outcome of Reed's motion for new
trial, or undermined the reliability of the
adversarial process. We find no merit in

1

> Reed's contention his right to counsel was
> violated.  As the record shows, Broome did
> not limit his representation of Reed. Reed
> also cannot show prejudicial error as to his
> remaining arguments, and these contentions
> also fail.

2

3

4  Reed II, 2013 WL 1276015, at *9-10 (footnotes omitted).

5      A claim of ineffective assistance of counsel is cognizable

6  as a claim of denial of the Sixth Amendment right to counsel,

7  which guarantees not only assistance, but effective assistance of

8  counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).

9  The benchmark for judging any claim of ineffectiveness must be

10 whether counsel's conduct so undermined the proper functioning of

11 the adversarial process that the trial cannot be relied upon as

12 having produced a just result.  Id.

13     In order to prevail on a Sixth Amendment ineffectiveness of

14 counsel claim, petitioner must establish two things.  First, he

15 must establish that counsel's performance was deficient, i.e.,

16 that it fell below an "objective standard of reasonableness"

17 under prevailing professional norms.  Strickland, 466 U.S. at

18 687-88.  Second, he must establish that he was prejudiced by

19 counsel's deficient performance, i.e., that "there is a

20 reasonable probability that, but for counsel's unprofessional

21 errors, the result of the proceeding would have been different."

22 Id. at 694.  "A reasonable probability is a probability

23 sufficient to undermine confidence in the outcome."  Id.

24     The Supreme Court in Strickland explained the development of

25 the principle that the right to counsel includes the right to

26 effective assistance of counsel, and explained that the right

27 could be impeded both by the defense attorney as well as by the

28 Government.  As to the latter, the Government can "violate[ ] the

United States District Court
Northern District of California

17

right to effective assistance when it interferes in certain ways with the ability of counsel to make independent decisions about how to conduct the defense," e.g., by barring attorney-client consultation during a recess, by barring summation at a bench trial, by requiring that the defendant be the first defense witness, and by barring direct examination of defendant. Id. at 686 (collecting cases).

Petitioner has failed to show that the state court denial of this claim was an unreasonable application of Supreme Court authority or an unreasonable determination of the facts. The California Court of Appeal remanded the case for the limited purpose of inquiring into Petitioner's claim of ineffective assistance of trial counsel. On remand the trial court held a Marsden hearing where Petitioner stated his reasons why he believed trial counsel was ineffective, and trial counsel responded. After conducting the inquiry as ordered by the California Court of Appeal, the trial court concluded that new counsel would be appointed to investigate two areas regarding trial counsel's handling of the case. Reporter's Transcript ("RT"), 8/13/10 at 10. The trial court stated:

> In light of what I have heard today, and having completed the inquiry now, as to what you feel would have been material in your trial and it appears that there may be inconclusively, but maybe two areas in which it would be appropriate to appoint counsel to represent you on the limited areas of the DNA and the results and what they mean and whether they were material to your trial or whether in fact you're misinterpreting those results and they were not material. Those are things that a newly appointed counsel will look at.

18

1

2

3

4

5

6

7

> The second area that newly appointed counsel
> will look at to determine whether there is a
> basis for a new trial is based on ineffective
> assistance of counsel is whether the failure
> to interview the witness [Bahati] prior to
> trial in any way had a material impact on the
> outcome.  So, those are the two areas in
> which the Court cannot make a conclusive
> determination and based upon counsel's
> response, and the fact that she does not have
> her file with her or her independent memory
> does not serve her well enough to be able to
> firmly respond, I am going to appoint counsel
> on those areas.

8

RT, 8/13/10 at 10-11.

9

10

11

12

13

14

15

16

17

18

19

20

21

Despite remand counsel being appointed to only investigate the DNA issue and the failure to interview witness Bahati, counsel filed a motion for a new trial raising four claims: (1) counsel failed to investigate an incident in which Dianne was allegedly found performing oral sex on a boy in a closet at the youth center;(2) counsel failed to call Petitioner to testify regarding the discipline he administered to Dianne as a result of incident above at the youth center; (3) counsel failed to secure the records showing when Bahati was released from jail, and failed to obtain Dianne's birth certificate to show her age at the time of the alleged incidents; and (4) counsel failed to preserve the record on appeal regarding the composition of the jury.  CT at 88-91.

22

23

24

25

26

The attorney appointed on remand did not raise the issues in the new trial motion that he was appointed to investigate.  It appears that trial counsel's reasons for not following up on the DNA issue-because it was frivolous-and not interviewing Bahati-because she was a prosecution witness-were justified.[2]  The

27

28

---

[2] Trial counsel recalled that the DNA evidence definitively linked Petitioner to the crime, but the DNA did not identify him as the

United States District Court
Northern District of California

United States District Court
Northern District of California

attorney appointed on remand raised the issues that Petitioner urged.  Thus, remand counsel could not have been deficient for raising the legal issues that Petitioner now argues should have been raised.  Even if there had been a deficiency due to counsel's failure to comply with the trial court's instructions, Petitioner cannot show prejudice.

The California Court of Appeal found harmless any error related to the trial court not addressing on remand the claims made in the motion for a new trial.  The California Court of Appeal stated:

> A.   The Closet Incident/Reed's Failure to Testify
>
> According to Reed's motion, it was his discipline that provided Dianne a motive to falsify her claims against him; Reed's reason for disciplining her was irrelevant and would not reasonably have altered the outcome.  The jury heard evidence that Reed had disciplined Dianne severely near the time she reported the abuse to police, and specifically, that while he was whipping her with a belt, she wanted to kill him.  Trial counsel urged the jury to be skeptical of Dianne's accusations, as she had "some motivation" to make a false claim because Reed "was trying to be a disciplinarian."
>
> B.   Failure to Call Appellant as a Witness
>
> Appellant argues trial counsel performed inadequately by failing to call him as a witness, though he had informed her of his desire to testify.  To the extent appellant's testimony would simply have provided a reason for the discipline he imposed on Dianne, it would not reasonably have altered the outcome.

---

victim's biological father.  It was not argued at trial that Petitioner was the biological father.

### C.   Failure to Secure Records

Reed presented no evidence demonstrating that Dianne's date of birth was different than the date on which the parties relied at trial and did not show that records of Bahati's release date would have impacted the outcome, given the parties' stipulation she was released a month after Dianne's 14th birthday and Dianne's testimony this was the only time Bahati was in jail.

### D.   Failure to Locate Bahati

Reed did not assert trial counsel's failure to locate Bahati in his motion for new trial, and he presented no evidence showing what testimony Bahati would have given.

### E.   Jury Composition

Reed simply alluded to a "failure to raise issues of the jury composition, which trial counsel never presented to the court or even mentioned during jury selection" and concluded "[t]rial counsel failed to preserve the record on appeal" as to this issue.  He presented no evidence regarding the jury's composition and did not make any showing he was prejudiced by the alleged failure to preserve this issue.

We conclude, accordingly, that even if the trial court erred in refusing to decide Reed's motion for new trial, he has not shown the error was reversible.

Reed II, 2013 WL 1276015, at *8-9 (footnotes omitted).

In Davis v. Ayala, 135 S. Ct. 2187 (2015), the Supreme Court recently clarified the standard to be used on habeas review of a state court's harmlessness analysis.  If a state court finds an error harmless, that determination is reviewed under the deferential AEDPA standard.  This means that relief is not available for the error "unless the state court's harmlessness determination itself was unreasonable."  Davis, 135 S. Ct. at 2199 (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)).  In other words, a federal court may grant relief only if the state court's

1   harmlessness determination "was so lacking in justification that

2   there was an error well understood and comprehended in existing

3   law beyond any possibility for fairminded disagreement." <u>Id</u>.

4   (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)).  And if

5   the federal court determines that the state court's harmless

6   error analysis was objectively unreasonable, it also must find

7   that the error was prejudicial under <u>Brecht v. Abrahamson</u>, 507

8   U.S. 619 (1993) before it can grant relief.  <u>See</u> <u>Fry</u>, 551 U.S. at

9   119-20 (§ 2254(d)(1) did not displace <u>Brecht</u>).

10      The state court's determination that any error was harmless

11  was not unreasonable.  Even if the trial court interfered with

12  remand counsel's ability to effectively make independent

13  decisions about how to conduct the investigation into trial

14  counsel's actions, there was no prejudice.  This claim is denied.[3]

15                              V

16      For the foregoing reasons, the petition for a writ of habeas

17  corpus is DENIED.

18      Further, a Certificate of Appealability is DENIED.  <u>See</u> Rule

19  11(a) of the Rules Governing Section 2254 Cases.  Petitioner has

20  not made "a substantial showing of the denial of a constitutional

21  right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated

22  that "reasonable jurists would find the district court's

23  assessment of the constitutional claims debatable or wrong."

24  <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).  Petitioner may not

25  _____

26  [3] Nor is Petitioner entitled to relief to the extent he argues that
    the trial court erred by not ruling on the motion for a new
27  trial.  This claim was not exhausted with the California Supreme
    Court, and the California Court of Appeal held that the trial
28  court did not err in its actions following the remand order from
    the California Court of Appeal.

United States District Court
Northern District of California

1 appeal the denial of a Certificate of Appealability in this Court

2 but may seek a certificate from the Court of Appeals for the

3 Ninth Circuit under Rule 22 of the Federal Rules of Appellate

4 Procedure.  See Rule 11(a) of the Rules Governing Section 2254

5 Cases.

6      The Clerk is directed to enter Judgment in favor of

7 Respondent and against Petitioner, terminate any pending motions

8 as moot and close the file.

9      IT IS SO ORDERED.

10 Dated: 02/09/2016

11

12                                    THELTON E. HENDERSON
                                     United States District Judge
13 G:\PRO-SE\TEH\HC.13\Reed5455.hc.docx

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

23